**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**U.S. COURTHOUSE**
**402 E. STATE STREET**
**TRENTON, NEW JERSEY 08608**

**Hon. Michael B. Kaplan**                                              **609-989-0478**
**United States Bankruptcy Judge**                                      **609-989-2259 Fax**

April 9, 2012

Diane A. Bettino, Esq.
Reed Smith LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Attorney for Defendant Wells Fargo Bank, N.A.

Gabriel H. Halpern, Esq.
PinilisHalpern, LLP
160 Morris Street
Morristown, NJ 07960
Attorney for Plaintiffs

     Re: Garsh v. Wells Fargo Bank, N.A.
       Case No. 11-21543 (MBK) (Chapter 11)
       Adv. No. 11-1788 (MBK)

Counselors:

   This matter is before the Court upon the motion ("Motion") of the Defendant, Wells

Fargo Bank, N.A. ("Wells Fargo") for summary judgment to dismiss the adversary complaint

filed by Plaintiffs, Stephen P. Garsh and Francesca Garsh (collectively the "Plaintiffs") with

prejudice.  The Court has reviewed the pleadings submitted and heard oral argument on February

29, 2012.  The Court issues the following ruling:

  **I.**   **JURISIDICTION**

   The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b),

1334(e)(1), 157(a) and the Standing Order of the United States District Court dated July 10,

1984, referring all bankruptcy cases to the bankruptcy court.  Plaintiffs allege that this matter is a

core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2); notwithstanding, to the extent the

Court determines the proceeding to be a non-core proceeding related to a case under title 11, Plaintiffs have consented to this Court entering appropriate orders and a final judgment. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.    The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[1]

## II.    PROCEDURAL HISTORY/FACTS

In December of 2007, Plaintiffs resided at 408 Euclid Avenue, Loch Arbour Village, New Jersey (the "Property"). At the time, Plaintiffs were seeking to refinance their mortgage and were approved for a "pick-a-payment" loan (the "Loan") by Wachovia Mortgage, FSB ("Wachovia"). Pursuant to the terms of the note, Plaintiffs had the option of selecting the amount of the initial payment, and elected to make a monthly payment of $2,998.97. Before the scheduled closing on February 1, 2008, the Plaintiffs received a Commitment Letter (the "Letter") on January 14, 2008 from Wachovia. The Letter disclosed that the $2,998.97 initial payment may not be sufficient to pay the entire amount of interest and could result in a negative amortization.

On February 1, 2008[2] Plaintiffs executed and delivered an adjustable rate mortgage note (the "ARM Note") to Wachovia Mortgage, FSB ("Wachovia") in the sum of $759,000, to refinance the Property. To secure the ARM Note, Plaintiffs executed and delivered on the same date a non-purchase money mortgage (the "Mortgage") against the Property to Wachovia, which

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] The Plaintiffs contend that the actual closing took place in the hospital where Plaintiff Stephen P. Garsh was admitted on February 2, 2008. Curiously, Wells Fargo's statement of undisputed material facts makes no mention of the hospital and states that closing occurred on February 1, 2008. The Loan documents at issue are signed and dated February 1, 2008.

was recorded in the office of the Clerk of Monmouth County on February 19, 2009.  The

Mortgage had an initial interest rate of 8.4%, which was subject to change on an annual basis

beginning on the first of December, 2008, and every twelfth month thereafter.  At the closing on

February 1, 2008, Plaintiffs read and signed an Acknowledgment Letter referencing the

following documents that were received by the Plaintiffs: (1) Truth-in-Lending Statement; (2)

Good Faith Estimate of Settlement Costs; (3) booklet describing closing procedures titled

"Settlement Costs: a Housing and Urban Development (HUD) Guide for Home Buyers;" (4)

Mortgage Servicing Transfer Disclosure; (5) a Loan Program Disclosure for the ARM; (6) a

Consumer Handbook on ARM ("CHARM"); (7) Referral Notice; and (8) Protecting Your

Privacy brochure (collectively the "Disclosures").

Further, the Plaintiffs read and executed the Truth-in-Lending disclosure detailing the

annual percentage rate and finance charges of their ARM Note, including a separate itemization

of the amount financed.  In addition, the Plaintiffs read and signed an acknowledgement (the

"Acknowledgment") that they had received two copies of the Notice of Right to Cancel

("NORC"), which provided instructions on how to cancel their ARM Note.  The Plaintiffs also

read and signed a Deferred Interest Acknowledgment, which explained the processes and impact

of deferred interests and negative amortization.  Lastly, Plaintiffs executed a HUD-1 Settlement

Statement ("HUD-1"), which summarized the fees and costs associated with the Loan.  Plaintiffs

did not exercise their right to cancel the Loan within three days of receipt of the NORC.

On November 1, 2009, Wells Fargo acquired Wachovia Mortgage, FSB, and is the

current holder of the ARM Note and Mortgage.  Plaintiffs defaulted on their loan on May 15,

2010, and were served with two Notices of Intent to Foreclose ("NOI") dated June 22, 2009, and

December 24, 2009.  Plaintiffs have failed to make any payments since that date.  On April 7,

2010, Wells Fargo filed its Complaint for Foreclosure against Plaintiffs in the Superior Court of

New Jersey, Monmouth County.   On May 13, 2011, Plaintiffs filed the within Adversary

Complaint, contending that Wells Fargo has violated the following federal and state laws: (1)

Truth in Lending Act (15 U.S.C. § 1601 et. seq.) ("TILA"); (2) the Homeownership Equity

Protection Act of 2002 ("HOEPA"); (3) the New Jersey Homeownership Security Act

("HOSA"); and the Consumer Fraud Act ("CFA") (collectively the "Acts").  On June 20, 2011,

Wells Fargo filed its Answer.  On December 22, 2011, Wells Fargo filed this Motion.

According to Wells Fargo, Plaintiffs have failed to establish a genuine dispute of material

fact, or put forth a legal basis to preclude the entry of summary judgment in its favor.  Plaintiffs

oppose the relief, asserting that there are disputes of fact concerning whether: (1) the statutes of

limitations have lapsed with respect to Wells Fargo's alleged violation of the Acts; and (2) the

Loan violates the Acts.  At oral argument on February 29, 2012, Wells Fargo conceded its statute

of limitations argument and Plaintiffs withdrew their HOSA claim.  Accordingly, these issues

will not be addressed in this opinion.  For the reasons which follow, the Court grants in part, and

denies in part, Wells Fargo's Motion.

III.    **DISCUSSION**

A.  **Summary Judgment Standard.**

Summary judgment is appropriate where "the pleadings, the discovery, and disclosure

materials on file, and any affidavits show there is no genuine dispute as to any material fact and

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[3] As the

Supreme Court has indicated, "Summary judgment procedure is properly regarded not as a

disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy, and inexpensive determination of every action.'"

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1).   In deciding a

motion for summary judgment, the judge's function is to determine if there is a genuine dispute

for trial. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993).

The moving party bears the initial burden of demonstrating the absence of a genuine

dispute of material fact. Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing

Celotex Corp., 477 U.S. at 323). In determining whether a factual dispute warranting trial exists,

the court must view the record evidence and the summary judgment submissions in the light

most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Issues of material fact are those "that might affect the outcome of the suit under the governing

law." Id. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could

disagree on the result. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (citations omitted). If the moving party will bear the burden of persuasion at trial, the

party must support its motion with credible evidence - using any of the materials specified in

---

[3] Federal Rule of Civil Procedure 56 was amended as of December 1, 2010. As noted by the court in Guiliano v. Coy (In re Coy):

> Subdivision (a) now contains the summary judgment standard previously stated in subdivision (c). Fed. R. Civ. P. 56 Advisory Committee's Note to 2010 Amendments ("Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word—genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). 2011 Bankr. LEXIS 3196, *6-7 (Bankr. D. Del. Aug. 22, 2011).

Rule 56(c) - that would entitle it to a directed verdict if not controverted at trial. Celotex Corp.,

477 U.S. at 331. Such an affirmative showing shifts the "burden of production" to the party

opposing the motion and requires the party to either demonstrate the existence of a "genuine

[dispute]" for trial or to request additional time for discovery under Fed. R. Civ. P. 56(f). Fed. R.

Civ. P. 56(e).

Once the moving party establishes the absence of a genuine dispute of material fact, the

burden then shifts to the non-moving party to "do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. A party may not defeat

a motion for summary judgment unless it sets forth specific facts, in a form that "would be

admissible in evidence," establishing the existence of a genuine dispute of material fact for trial.

Fed. R. Civ. P. 56(e) (providing that in response to a summary judgment motion the "adverse

party may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine [dispute] for trial"). See also Fireman's Ins. Co. of Newark, N.J. v.

DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); Olympic Junior, Inc. v. David Crystal, Inc., 463

F.2d 1141, 1146 (3d Cir. 1972).  If the nonmoving party's evidence is a mere scintilla or is not

"significantly probative," the court may grant summary judgment. Liberty Lobby, Inc., 477 U.S.

at 249-50. The non-movant will prevail only if the evidence produced is of "sufficient quantum

and quality" to allow a rational and fair-minded fact finder to return a verdict in his favor,

bearing in mind the applicable standard of proof that would apply at trial on the merits. Id. at

249.

**B. Plaintiffs' TILA Claims.**

Plaintiffs argue that the Loan violates TILA and that they are entitled to the remedy of recession because (1) Wells Fargo failed to provide accurate and material disclosures; (2) Wells Fargo failed to provide proper notice of the right to rescind; and/or (3) Wells Fargo extended credit to the Plaintiffs without considering their ability to repay the Loan. In response, Wells Fargo submits that it provided accurate, material disclosures, including the requisite NORC, in compliance with TILA and Regulation Z. TILA serves to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Regulation Z implements TILA and promotes the "informed use of consumer credit by requiring disclosures about its terms and cost." 12 C.F.R. § 226.1(b). Under Regulation Z, lenders are required to make certain disclosures "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.31(b). Such disclosures include: "(1) the identity of the creditor; (2) the "amount financed;" (3) the "finance charge;" (4) the "annual percentage rate;" (5) the sum of the amount financed and the finance charge, or "total of payments;" (6) the number, amount, and due dates or period of payments scheduled; (7) the "total sale price;" and (8) explanations and definitions of the foregoing terms." Cappuccio v. Prime Capital Funding LLC, 649 F.3d 180, 188 (3d Cir. 2011) (citing 15 U.S.C. § 1638; 12 C.F.R. § 226.18).

**1.  Wells Fargo Provided All Material Disclosures Required Under TILA.**

Plaintiffs contend that there are material disputes of fact as to whether the disclosures required under TILA were provided, and whether they are accurate.  The Court, however, finds that exhibit K to Ms. Bettino's certification evidences that the Plaintiffs read and executed an Acknowledgment Letter, affirming that they were provided the Disclosures as required under TILA and Regulation Z. See Bettino Cert., Ex. K., Docket No. 8.  Further, the Loan Program Disclosure statement clearly and conspicuously, details how the Loan worked in accordance with 12 C.F.R. § 226.19(b)(2).  Specifically, it sets forth how to calculate the initial payment, and provides examples as required under § 226.19(b)(2).  Moreover, it is uncontested that Plaintiffs read and individually signed the Federal Truth in Lending Disclosure, as required by Regulation Z, which states the annual percentage rate ("APR"), finance charge, the amount financed, and total payments due, in addition to a separate itemized payment schedule showing the amount financed.  Thus, the Court is satisfied that Wells Fargo provided Plaintiffs with the requisite disclosures as required by TILA, and that no rational and fair-minded fact finder could determine otherwise. See Bettino Cert. Ex. K., Docket No. 8; see also Burnham v. WMC Mortg. Corp., CIVA076101JBSKMW, 2010 WL 2560657 (D.N.J. June 21, 2010) ("written acknowledgment of receipt of any disclosures required under [the TILA] by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof").  Plaintiffs have offered no evidence to rebut the presumption of receipt.

**2. Wells Fargo Accurately Disclosed the Recording Fees Paid to Public Officials Under 12 C.F.R. § 226.4(e)(1).**

Plaintiffs further maintain that Wells Fargo failed to accurately disclose the recording fees paid to public officials in the HUD-1, as required by 12 C.F.R. § 226.4(e)(1).[4]  The HUD-1 lists $265.00 as the amount paid to public officials for recording the Mortgage, whereas Plaintiffs assert that the total filing fee should have been $150.00.  The 2008 New Jersey Lawyers Diary and Manual states that it cost $30.00 to record the first page of any instrument, and $10.00 for each additional page thereafter. See Garish Cert., Ex. A., Docket No. 13.  Therefore, based upon Plaintiffs' calculation, the total filing fee for recording the 13 page Mortgage should have been $150.00.[5]  While Wells Fargo appears to have overstated the amount paid to public officials, "such recording fees do not have to be disclosed as part of the finance charge." In Re Hollis, 2009 WL 3030125, *5 (Bankr. D.N.J. Sept. 17, 2009).  "Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction," are exempted from computation of a finance charge. Hollis, 2009 WL 3030125 at *5 (citing 15 U.S.C. § 605(d)(1)).  Therefore, the Court finds that Wells Fargo had no legal obligation to include the

---

[4] TILA deems the finance charge as a material disclosure. 15 U.S.C. § 1602(u).  TILA defines a finance charge as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).  Regulation Z defines a finance charge as "the cost of consumer credit as a dollar amount," which "includes any charge payable directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4. The failure to make a material disclosure or one that is made inaccurately, could entitle the consumer to rescind the loan.

[5] A finance charge disclosure cannot vary from the actual finance charge by more than $35.00. 15 U.S.C. § 1635(i); 12 C.F.R. § 226.23(b)(2)(i)

recording fee as part of the finance charges, and thus, did not overstate the amount paid to public

officials for the purposes of 12 C.F.R. § 226.4(e)(1).[6]

> **3. There Remains A Dispute of Fact as to Whether Wells Fargo Properly Considered the Plaintiffs' Ability to Repay the Loan Before Extending Them Credit.**

Plaintiffs submit that Wells Fargo violated 12 C.F.R. § 226.34(a)(4) by extending credit

to the Plaintiffs, without taking into consideration their ability to repay the Loan.   Under

§ 226.34(a)(4), a creditor extending mortgage credit shall not extend credit to a "consumer based

on the value of the consumer's collateral without regard to the consumer's repayment ability as of

consummation, including the consumer's current and reasonably expected income, employment,

assets other than the collateral, current obligations, and mortgage-related obligations." 12 C.F.R.

§ 226.34(a)(4).   Wells Fargo asserts that the Plaintiffs were approved for the Loan based upon

their representations in the Uniform Residential Loan Application (the "Loan Application"). See

Bettino Cert., Ex. O, Docket No. 8.   The Loan Application states that Plaintiffs' had a monthly

income of $20,000.00, and assets totaling nearly $2,000,000.00.   Wells Fargo further contends

that Plaintiffs received a "Commitment Letter" dated January 14, 2008, which provided

additional information about the Loan, and clearly stated that Wachovia "relied on the

information and representations in your application documents in making this offer." Bettino

Cert. Ex. P., Docket No. 8.   Specifically, the Commitment Letter disclosed that the initial

payment that Plaintiffs picked "may not be sufficient to pay the entire amount of interest that will

accrue on the unpaid loan amount." Id.   Thus, Wells Fargo argues that the Commitment Letter

---

[6] As will be expanded upon below, even if the Court did find that Wells Fargo overstated the amount paid to public officials, Plaintiffs would not be entitled to rescind the Loan.

placed the Plaintiffs on notice that their election of making a low first payment could result in negative amortization. Id.    Lastly, Wells Fargo claims that the "Deferred Interest Acknowledgment," which Plaintiffs signed, clearly defines the process of negative amortization.[7] Id. at Ex. Q.

Plaintiffs, on the other hand, assert that the payment schedule evidences that they did not have the ability to repay the Loan. Specifically, the Plaintiffs take issue with the scheduled payment of 265 installments of $7,776.84, set to begin on January 15, 2016. Without testimony from a representative of the Loan originator, or evidence from someone who had knowledge of the review process in approving the Plaintiffs' Loan, the Court cannot conclude at this juncture that Wells Fargo considered the Plaintiffs' current and reasonably expected income, employment and  assets other than the collateral, when extending Plaintiffs credit. Nothing in the record before the Court evidences an analysis and decision by Wells Fargo with respect to Plaintiffs' ability to service the installments of $7,776.84. Therefore, a material dispute of fact exists as to Wells Fargo's consideration of the Plaintiffs' ability to repay the Loan, and therefore the issue of whether Wells Fargo violated 12 C.F.R. § 226.34(a)(4) will be reserved for trial.

### 4.   Plaintiffs Are Not Entitled to Rescind the Loan Under TILA.

In further support of their TILA claim, Plaintiffs contend that Wells Fargo failed to provide them with the three day NORC. A review of the NORC reveals that Plaintiffs not only signed the NORC on February 1, 2008, but also expressly acknowledged receiving two copies of

---

[7] The Acknowledgment Letter provides examples of how the negative amortization works, such as: "if you owe $1,000.00 in interest in a given period but you make a $900.00 payment that is authorized by your loan, the $100 shortfall is deferred interest that is added to your loan balance. In subsequent months, you will be charged interest on the higher principal balance." See Bettino Cert., Ex. Q., Docket No. 8

that document.   While there is a dispute as to the date of the closing, and whether this alleged

inaccuracy deprived the Plaintiffs of the three-day right to rescind, the NORC inconspicuously

states that "[y]ou have a legal right under federal law to cancel this transaction without cost,

within three business days from whichever of the following events occurs last: (1) the date of the

new transaction, which is February 1, 2008, or (2) the date you received your new Truth-in-

Lending disclosures, or (3) the date you received this notice of your right to cancel." See Bettino

Cert., Ex. N., Docket No. 8.   Therefore, even if the NORC was signed on February 2, 2008,

under subsection (3) of the NORC, receiving the NORC on said date would be the last event to

occur and would thus commence the three day period to rescind.   Since the Plaintiffs did not seek

to rescind their loan until they filed the Adversary Complaint, the Plaintiffs cannot now avail

themselves of the three-year statute of repose. See 12 C.F.R. § 226.15(a)(3).   Once again,

Plaintiffs offer no evidence to rebut the presumption of timely receipt.   Accordingly, the Court

finds no violation arising from the timeliness of the disclosures.[8]

With regard to the Plaintiffs' right to rescind the Loan, even were the Court to find

ultimately that Wells Fargo violated TILA, Plaintiffs are precluded from rescinding the Loan

because they cannot tender the $153,495.20 required to effectuate rescission.[9]   Indeed, TILA and

_____

[8] As previously stated, exhibit K to Ms. Bettino's certification establishes that the Plaintiffs read and signed an Acknowledgment Letter affirming that they were provided the Disclosures as required under TILA and Regulation Z.   Thus, the Court is satisfied that Wells Fargo provided Plaintiffs with the requisite disclosures as required by TILA. See Bettino Cert. Ex. K., Docket No. 8; see also Burnham v. WMC Mortg. Corp., CIVA076101JBSKMW, 2010 WL 2560657 (D.N.J. June 21, 2010) ("written acknowledgment of receipt of any disclosures required under [the TILA] by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof").

[9] Pursuant to 12 C.F.R. § 226.23(f), special tender rules apply if a consumer refinances a loan with his original lender.   Section 226.23(f) provides that the right to rescind only applies in such a transaction "to the extent the new amount financed exceeds the unpaid principal balance, any earned unpaid finance charge on the existing debt, and

Regulation Z permit rescission of a Loan that violates the acts; however, the consumer must

tender or return any property that was provided by the lender as a result of the mortgage loan

upon rescission. See US Bank Nat. Ass'n v. Guillaume, 2012 WL 603307, *15 (N.J. Feb. 27,

2012) (citing McKenna v. First Horizon Home Loan Corp., 475 *F*.3d 418, 421 (1st Cir.2007));

see also 15 U.S.C. § 1635(b); see also 12 C.F.R. § 226.23(d)(3).  Furthermore, both TILA and

Regulation Z authorize the Court to modify the process of tender by order. See Official Staff

Commentary 12 C.F.R. § 226.23(f)(4).

The New Jersey Supreme Court upheld recently a trial court's modified tender procedure

in a foreclosure case, holding that a "court has the discretion to deny rescission under TILA if the

[borrower] . . . cannot tender the balance of his or her loan." Guillaume, 2012 WL 603307 at

*17.  Justice Patterson based her decision on the borrowers' inability to make a single mortgage

payment after they first defaulted in April of 2008, and the fact that the record provided no

support for the borrowers' contention that they were in a position to tender the balance due. 2012

WL 603307 at *17.  Similarly, the record before the Court provides no support for the contention

that Plaintiffs are in a position to tender the balance due.  Plaintiffs have been in default of the

Loan since May 15, 2009, and have failed to make a single payment thereafter.  At oral

---

amounts attributed solely to the costs of the refinancing or consolidation." § 226.23(f).  The commentary to
Regulation Z further states that "[i]n a merger, consolidation, or acquisition, the successor institution is considered
the original creditor for purposes of [this exemption]." See Official Staff Commentary 12 C.F.R. § 226.23(f)(4).
In this case, Debtor used Wachovia to refinance a loan held with Wachovia.  Wells Fargo acquired Wachovia, and
therefore, steps into the shoes of Wachovia as the original lender. Accordingly, the right to rescind in this case only
applies to the new amount financed, which exceeded the unpaid principal balance.  Box 1501 of the HUD-1
indicates that the Plaintiffs' refinance paid off a $571,524.00 mortgage with Wachovia. Bettino Cert., Ex. A.,
Docket No. 13.  Box 1520 of the HUD-1 shows that the total amount disbursed was $753,337.00.  Thus, the amount
of new money loaned was $181,813.00.  Id. The HUD-1 also discloses that the Plaintiffs incurred $28,317.80 at the
closing, representing the total amount of fees and charges to be credited to the Plaintiffs.  Id.  Therefore, the total
amount Plaintiffs would be require to tender is $153,495.20 (subtracting $28,317.80 from $181,813).

argument, Plaintiffs admitted that they have not located a bank that can refinance the current

Loan.  This is unsurprising given that Plaintiffs' Schedule A to their Voluntary Petition further

reflects a value for their home of $475,000.00 and a total mortgage indebtedness of $782,783.00.

No rational or fair-minded fact finder could conclude that a refinance of this Property is feasible.

Moreover, Plaintiffs' Schedules I and J show only $100.83 in disposable monthly income.

Clearly, Plaintiffs' income does not approach the amounts necessary to satisfy the $153,495.20

recession obligation under their Chapter 13 plan.  Therefore, this Court will apply the decision in

Guillaume, and the direction of a majority of federal appellate courts[10], and rule that Plaintiffs

---

[10]Jobe v. Argent Mortg. Co., LLC, 373 F. App'x 260, 262 (3d Cir. 2010) ("courts have the "discretion to condition rescission on tender by the borrower of the property he has received from the lender." Ljepava v. M.L.S.C. Props., Inc., 511 F.2d 935, 944 (9th Cir.1975).  Other courts have denied rescission where the borrowers were unable to tender payment of the loan amount."); Yamamoto v. Bank of New York, 329 F.3d 1167, 1173 (9th Cir. 2003) ("there is no reason why a court that may alter the sequence of procedures *after* deciding that rescission is warranted, may not do so *before* deciding that rescission is warranted when it finds that, assuming grounds for rescission exist, rescission still could not be enforced because the borrower cannot comply with the borrower's rescission obligations no matter what.  Such a decision lies within the court's equitable discretion . . ."); Williams v. Homestake Mortg. Co., 968 F.2d 1137, 1142 (11th Cir. 1992) ("Thus, we hold that a court may impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all surrounding circumstances."); Am. Mortg. Network, Inc. v. Shelton, 486 F.3d 815, 821 (4th Cir. 2007) (Once the trial judge in this case determined that the Sheltons were unable to tender the loan proceeds, the remedy of unconditional rescission was inappropriate."); Moore v. Wells Fargo Bank, N.A., 597 F. Supp. 2d 612, 616 (E.D. Va. 2009) ("In a scenario involving a contested rescission, such as the instant matter, if the trial judge determines that the plaintiff seeking rescission is "unable to tender the loan proceeds, the remedy of unconditional rescission [i]s inappropriate.""); Fed. Deposit Ins. Corp. v. Hughes Dev. Co., Inc., 938 F.2d 889, 890 (8th Cir. 1991) ("TILA generally provides that the creditor shall perform first (i.e., return monies paid by the debtor and release its security interest); however, the Act gives courts discretion to devise other procedures, 15 U.S.C. § 1635(b), including conditioning rescissions upon the debtor's prior return of the principal."); In re O'Brien, 423 B.R. 477, 497 (Bankr. D.N.J. 2010) aff'd sub nom. Cleveland v. O'Brien, 2010 WL 4703781 (D.N.J. Nov. 12, 2010) ("If the creditor does comply with the rescission, the borrower must then tender the money or property to the creditor. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(3).  The courts have the equitable authority to modify the parties' obligations.").

are not entitled to rescission under TILA because they are unable to tender the money advanced

to them by Wells Fargo.  As such, Plaintiffs' TILA claim fails as a matter of law, and will be

dismissed for failing to state a claim upon which relief can be granted.

### C.  Summary Judgment Is Granted In Favor Of Wells Fargo On Plaintiffs' Claim for Violation of HOEPA.

Plaintiffs contend that the Loan issued by Wells Fargo is a high interest loan in violation

of HOEPA.  HOEPA defines a "high cost" mortgage as a "consumer credit transaction that is

secured by the consumer's principal dwelling, other than a reverse mortgage transaction," which

contains either a high annual percentage rate or excessive points and fees. 15 U.S.C. §1602(aa);

12 C.F.R. § 226.2(a)(19).  Specifically, a loan is subject to HOEPA if: (1) the APR exceeds the

rate for U.S. Treasury securities with a comparable maturity by more than ten percentage points

(the "APR Threshold"); or (2) the points and fees paid by the consumer exceed the greater of

eight percent of the loan amount or $400.00 (the "Points and Fees Threshold") (collectively the

"Trigger Events"). § 1602(aa).  If either of the Trigger Events occurs, a creditor must provide

special pre-closing disclosures, in addition to those required by TILA.

Here, Plaintiffs have signed an acknowledgment of receipt of the Truth in Lending

Disclosure which reveals an 8.26% APR on their loan.  See Bettino Cert., Ex. M., Docket. No.

13.  The comparable daily treasury yield curve, at the same 30 year maturity date as the Loan,

lists that the yield was 4.280% on January 15, 2008.  Therefore, whether the actual APR was

8.26%, or 11.95% as Plaintiffs claim, the APR does not exceed the APR Threshold.  Thus, the

Loan is not a "high cost" mortgage under HOEPA.  Likewise, the Loan does exceed the Points

and Fees Threshold.  Under HOEPA, "points and fees' that are not "finance charges" must be

excluded from the total loan amount calculation. See 12 C.F.R. § 226.4(a).  For example, charges

such as application fees, appraisal fees, escrow fees, and title insurance are excludable costs and

are not calculated as part of the prepaid finance charge, as they are charges generally paid to

third parties other than the creditor.  See 12 C.F.R. § 226.4(c).

The closing documentation which is part of the record before the Court shows clearly that

once the appraisal fee ($375.00), escrow fee for hazard insurance ($221.38) and property taxes

($533.04), and title insurance ($2,305) were deducted from the settlement charges Plaintiffs paid

at closing ($6,295.25), Plaintiffs' actual points and fees paid were $2,860.83.  This amount,

subtracted from the principal ($759,000.00), results in a total loan amount of $756,139.17.

Therefore, after applying the 8% Points and Fees Threshold to this loan amount, the total Points

and Fees Threshold is $60,491.00.  This Loan does not exceed the Points and Fees Threshold

because the actual points and fees paid by Plaintiffs ($2,860.83) is less than the loan's total

Points and Fees Threshold ($60,491.00).  Consequently, the Court dismisses Plaintiff's claim for

violation of HOEPA as a matter of law.

### D. Summary Judgment in Favor of Wells Fargo on Plaintiff's Claim for Violation of The CFA is Denied, Without Prejudice.

Plaintiffs allege that Wells Fargo violated the CFA by engaging in unconscionable

commercial practice, deception, fraud, false pretense, false promise, and misrepresentation when

it entered into the Loan with the Plaintiffs.  Specifically, Plaintiff Stephen Garsh contends that he

was coerced by a representative of Wachovia into closing on the Loan on February 2, 2008---and

not on February 1, 2008 as Wells Fargo claims---while hospitalized at Jersey Shore Medical

Center.  Mr. Garsh further claims that a representative of Wachovia pressured him into executing

the Loan documents by threatening that if he were to not close, he would not receive the below

market rate of interest.  Additionally, Mr. Garsh contends that he signed the Loan documents

under the influence of drugs and pain medications, which affected his ability to understand and

review the terms of the Loan.

To state a valid claim for violation under the CFA, Plaintiffs must establish: "(1) an

unlawful practice, (2) an "ascertainable loss," and (3) "a causal relationship between the

unlawful conduct and the ascertainable loss," Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 521

(2010) (citing see Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557, 964 A.2d 741 (2009)).  If

Plaintiffs are successful in proving these elements, they are entitled to "legal and/or equitable

relief, treble damages, and reasonable attorneys' fees." Lee, 203 N.J. at 521 (citing N.J.S.A. §

56:8-19).  The CFA defines an unlawful practice as "any unconscionable commercial practice,

deception, fraud, false pretense, false promise, [or] misrepresentation ... in connection with the

sale or advertisement of any merchandise...." , 203 N.J. at 521-22 (citing N.J.S.A. § 56:8-2).  An

ascertainable loss is a loss that is "quantifiable or measurable," and not "hypothetical or

illusory." Id. at 522 (citing Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248, 872

A.2d 783 (2005)).  A consumer can establish causation by demonstrating that he suffered an

ascertainable loss as a result of the unlawful practice. Id. (citing N.J.S.A. § 56:8-19).  Due to its

remedial nature, the Court must construe the CFA "liberally to accomplish its broad purpose of

safeguarding the public." Id.

The Court previously ruled that Wells Fargo had provided to Plaintiffs all of the required

material disclosures in connection with the Loan transaction.  Accordingly, this fact is not at

17

issue with respect to Plaintiffs' CFA claim.  Mr. Garsh's capacity to understand and execute the

loan documents does, however, raise material disputes of fact that merit further inquiry by this

Court.  Likewise, whether Wells Fargo properly considered the Plaintiffs' ability to repay the

Loan before extending them credit presents an interesting question of law as to whether a

violation of TILA, notwithstanding the absence of a Plaintiff's ability to rescind the transaction,

in turn triggers a violation under the CFA.  In other words, if Plaintiffs establish at trial that

Wells Fargo violated TILA by failing to consider Plaintiffs' ability to repay the Loan, does that

violation alone give rise to a violation under the CFA?

The Court is aware of Judge Lyons' decision in In Re Bagot, 2012 WL 734178 (Bankr.

D.N.J. Mar. 6, 2012), where he found that knowingly advising borrowers to apply for a refinance

of a mortgage that the borrowers could not afford, could constitute an unconscionable

commercial practice under the CFA.  In Re Bagot, 2012 WL 734178 at *6.  Judge Lyons

determined that there were questions of fact as to whether the loan was predatory and whether

the mortgage solicitor engaged in an unconscionable commercial practice in violation of the

CFA.[11]  2012 WL 734178 at *4.  The Court notes, however, that the borrowers in Bagot relied

solely upon social security as their primary source of income, possibly distinguishing the case

from this matter, where the Plaintiffs represented a monthly income of $20,000.00 and assets

---

[11] Judge Lyons defined predatory lending as :

> a mismatch between the needs and capacity of the borrower.... In essence, the loan does not fit the
> borrower, either because the borrower's underlying needs for the loan are not being met or the
> terms of the loan are so disadvantageous to that particular borrower that there is little likelihood
> that the borrower has the capability to repay the loan.

In Re Bagot, 2012 WL 734178 at *4.

totaling nearly $2 million. See Bettino Cert., Ex. O., Docket No. 8.   Regardless of any

distinctions, factual question remain relating to whether this Loan was affordable from the

beginning, and not just after the point at which the negative amortization occurred, as well as the

alleged coercive tactics of Wells Fargo's representative in closing the Loan while Mr. Garsh was

incapacitated.   Therefore, the Court denies summary judgment as to the CFA counts of the

Adversary Complaint.

### IV.    CONCLUSION

In light of the foregoing, the Motion is granted with respect to claims for violations of

TILA and HOEPA, but denied with regards to the claim for violations of the CFA.  The Parties

are welcome to make further submissions to address the Court's questions concerning the

Plaintiffs' claim for violations of the CFA, which the Court will entertain upon motions for

summary judgment.  Wells Fargo is to submit a form of order to the Court.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: April 9, 2012